IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


PATRICIA A. COLBERT,                    :

                    Plaintiff           :       Civil Action 2:08-cv-631

        v.                              :       Judge Frost

COMMISSIONER OF SOCIAL                  :       Magistrate Judge Abel
SECURITY,
                                        :
                    Defendant


## REPORT AND RECOMMENDATION

Plaintiff Patricia A. Colbert brings this action under 42 U.S.C. §423 for review of a final decision of the Commissioner of Social Security denying her application for disability insurance benefits. The matter is before the Magistrate Judge for a report and recommendation on the disposition of this matter.

**Summary of Issues**.

Plaintiff Patricia A. Colbert asserts that she became disabled at age 39 by severe gastrointestinal problems and a depressive disorder. The administrative law judge ("ALJ") found that Colbert retains the residual functional capacity to perform light work, subject to certain limitations. Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

● The ALJ failed to consider Plaintiff's request that Colbert's disability insurance benefits application be treated as an oral inquiry for Supplemental

Security Income benefits.  Plaintiff alleges that when she applied for benefits in January 2004, she was incorrectly told by Social Security personnel that she was not eligible for SSI.  She argues that her application for Title II benefits should be construed as an oral inquiry for SSI as well, pursuant to 20 CFR §416.345.

● The ALJ failed to consider a later onset date than that originally alleged. In her application, Plaintiff initially claimed an onset date of November 2, 2000. However, in a written closing statement on the record, Plaintiff amended her onset date to August 1, 2003.  Plaintiff argues that the ALJ's analysis incorrectly utilizes the original 2000 onset date.  Morever, Plaintiff argues that the ALJ only addressed records in the file that preceded Plaintiff's last date insured, even though medical evidence concerning a chronic condition subsequent to a claimant's date last insured may be probative of a claimant's condition prior to such date.

● The ALJ failed to consider the combined effects of Colbert's impairments. Plaintiff argues that the ALJ found that her physical limitations were not disabling, and that her mental limitations were not disabling, but that the ALJ failed to consider whether the combination of the two was disabling, pursuant to 42 U.S.C. §423(d)(2)(B).

<u>Procedural History</u>. On January 21, 2004, Plaintiff filed her application for a period of disability and disability insurance benefits.[1]  She alleged that she had become disabled on November 2, 2000 at age 36, by severe intestinal disorders.  (R.

---

[1]  Plaintiff requests that the Court consider her to have filed a constructive application for SSI benefits on that date as well.  Doc. 11 at 26.

63, 67.)  Her claim was denied initially on May 11, 2004, and upon reconsideration on July 30, 2004.  (R. 14.)  Plaintiff sought a de novo hearing before an administrative law judge.  On November 14, 2006, an ALJ held a hearing at which Plaintiff, represented by counsel, appeared and testified.  (R. 650.)  In a written closing statement after the hearing, Plaintiff subsequently revised her date of onset to August 1, 2003.  (R. 25.) On January 26, 2007, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act.  (R. 11.)  On May 8, 2008, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the final decision of the Commissioner of Social Security.  (R. 4.)  On July 8, 2008, Plaintiff timely filed this action (Doc. 4.).

**Age, Education, and Work Experience**.  Colbert was born on May 18, 1964.  (R. 63.)  She is a high school graduate.  (R. 73.)  She has worked primarily in retail, in a variety of roles, including floor supervisor, assistance manager, and area coordinator.  (R. 68.)  She last worked, in retail management, on an unknown date in March 2000.  (R. 67.)

**Plaintiff's Testimony**.  The administrative law judge fairly summarized Moore's testimony at the hearing as follows:

> The claimant testified that she cannot be in close proximity to a big crowd and road traffic causes anxiety, but she does drive around her neighborhood to go to grocery store or doctor appointments.  She testified that she had not driven more than a few blocks in the last few months.  Prior to that she was driving farther.  She testified that she stopped working because her employer went out of business.  Thereafter her husband told her he did not want her going back to work.  Consequently she did not return to work.  The last time she worked was January 2000.  The claimant did not file a claim until January

2004. She said during the period in question she was ill and in the hospital often, and taking care of her mother at the same time. She testified she was told by the Pickaway Department of Children and Family Services that she would not be able to obtain any help through Social Security, so she did not apply for benefits right away. The claimant testified that she could not work because she spent most of her time in the bathroom with vomiting and diarrhea. She says she had had diarrhea 3 to 4 times per week and had to wear padded undergarments to handle bowel accidents. During 2000-2003 she said she spent most of her time with her parents, did not go out, did not go to church, and preferred to stay at home in the quiet. She said she reads for a hobby and watches television. She testified that her husband called her once a month. She did not live with him and had been separated for six years. She said she does house chores, taking it one room at a time because she gets tired.

(R. 17.) For three years, Colbert took care of her mother "daily from morning to night" doing "[e]verything, from bathing her, to fix her something to eat, get her to bed at night, moving her around." (R. 671-72.) Her mother passed away in 2003 or 2004. At the time of the hearing before the ALJ, Colbert was providing the same kind of care for her father. (R. 672.) While she fulfilled her filial duty to care for her mother, it took a lot out of her. (R. 673.) She did not do the laundry or fix meals. (R. 674-75.) When taking care of her mother, Colbert was sick to her stomach and had diarrhea and vomiting 3-4 during a week. (R. 676.) She had "accidents" 2-3 times a week, when she could not get to the bathroom in time. (R. 677.)

**Medical Evidence of Record**.

Although the administrative law judge's decision contains a summary of the relevant medical evidence of record, Colbert claims that the ALJ erred by only addressing records in the file that predated her last date insured, December 31,

2003. This Report and Recommendation will summarize, in some detail, the relevant medical evidence of record through December 31, 2004.

### Physical Impairments.

Berger Hospital. From 2001 to 2004, Colbert was repeatedly admitted to, examined at, or treated at Berger Hospital.

On January 8, 2001, a doctor at Berger Hospital conducted an ultrasound examination of Colbert's gallbladder and right upper quadrant, because of pain in her right upper quarter radiating to her back. (R. 162.) The ultrasound showed that Colbert's gallbladder was distended, with tenderness consistent with a positive ultrasound Murphy sign. No gallstones or thickening of the wall were noted. (R. 162.)

On January 19, 2001, Colbert underwent a radionuclide stress hepatobiliary scan as a follow-up to her ultrasound. This test was abnormal or positive, indicating possible acalculous cholecystitis. (R. 159.)

On February 9, 2001, Colbert was examined by Dr. F. Moshtaghi, D. O., who noted abdominal tenderness in the upper right quadrant, mid-gastric area. His impression was acalculous cholecystitis, and recommended a cholecystectomy. After discussing the procedure with Colbert, he scheduled her for a laparoscopic cholecystectomy on February 15, 2001. (R. 125-126.)

On February 11, 2001, Colbert went to the emergency room, complaining of right upper quadrant abdominal pain and nausea. She was given pain medication,

and discharged to await her upcoming surgery. (R. 155-156.)

On February 13, 2001, Colbert went to the emergency room, again complaining of right upper quadrant abdominal pain and nausea. She was given pain medication, and discharged to await her upcoming surgery. (R. 153-154.)

On February 15, 2001, Colbert underwent a laparoscopic cholecystectomy. The operation proceeded without complications. The preoperative diagnosis was acalculous cholecystitis, and the postoperative diagnosis was cholecystitis with lithiasis and black stones. (R. 151-152.)

On February 22, 2001, Colbert went to the emergency room, complaining of vomiting, diarrhea, and a "heavy aching feeling" in her right upper quadrant. She was administered medication, and advised that her symptoms were probably the result of a virus in the community. (R. 149-150.)

On February 28, 2001, Colbert went to the emergency room, complaining of vomiting and diarrhea. She was administered an IV of saline for hydration, and diagnosed with gastroenteritis. (R. 147.148.)

On April 16, 2001, Colbert went to the emergency room, complaining of vomiting any time she ate, and pain in the mid chest and subxiphoid areas. The attending physician found that she had no evidence of a cardiopulmonary event, but that she had acute chest pain and chronic anemia, and noted that Colbert was probably suffering from a midepigastric gastroesophageal process. He recommended that she receive an outpatient transfusion at some point to address her anemia. (R. 137-138.)

On April 25, 2001, Colbert returned to Berger Hospital for a follow-up from her April 16, 2001 emergency room visit. She reported chronic irritable bowel syndrome and diarrhea which had not changed since her cholecystectomy. Colbert was given a complete blood work test, an EKG, and a chest x-ray, all of which were normal. (R. 447.) She was prescribed Prevacid, and the doctor contacted her psychiatrist, Dr. Shy, to see if she could be switched to Wellbutrin from her existing SSRI before further blood work.

On May 11, 2001, Colbert again returned for a follow-up. The doctor repeated her blood work. Colbert reported that the Wellbutrin had not been helping her, and that she been having frequent crying episodes. (R. 446.)

On May 22, 2001, Colbert went to the emergency room for an evaluation, after suffering a syncopal spell. (R. 128.) She reported having felt weak for several weeks, and having lost thirty pounds. Colbert was diagnosed with microcytic hypochromic anemia, hematuria, unintentional weight loss, and syncope, secondary to orthostasis. (*Id.*) Iron studies and a CT of the abdomen and pelvis, were requested, and Colbert was advised to follow up with her physician to review CT results and discuss EGD and a colonoscopy.

On May 23, 2001, Colbert went to the emergency room, complaining of dyspnea and dizziness. She reported that she had been suffering from frequent diarrhea for the last two weeks. (R. 446.) Colbert was advised to drink plenty of fluids and given a prescription for iron.

On July 22, 2002, Colbert received a chest x-ray. The results were normal.

(R. 456.)

On July 23, 2002, Colbert underwent an EGD with biopsy for H. pylori, as a result of nausea and vomiting. The physician found inflammation at the pylorus and antrum, and an ulcer at the pylorus. He recommended a follow-up of her helicobacter pylori status, for possible treatment if indicated. (R. 163.)

On July 9, 2003, Colbert went to the emergency room, complaining of light-headedness and dizziness leading to nausea and vomiting. (R. 166.) The attending physician noted that Colbert made "[n]o complaint of bowel or urinary symptoms." (R. 167.) She was diagnosed with positional vertigo, and treated with Antivert. The doctor also ordered blood work to address anemia from probable iron deficiency, and instructed Colbert to follow up with her physician. (R. 168.)

On August 1, 2003, Colbert went to the emergency room, complaining of mid-sternal chest pain, vomiting, and mild headache, which had begun in the morning and continued all day, and diarrhea on the previous day. At intake, Colbert report-ed that her pain was presently a 4, but had been as high as an 8 out of 10; the doctor noted that "Patient appears miserable in fact is vomiting at the present time." (R. 189.) She was admitted to the hospital for further evaluation and treat-ment. (R. 187.) Colbert was treated initially with nitroglycerin for chest pain, and held for evaluation through August 5, at which point her pain, nausea, and vomit-ing had ceased. During her stay she underwent a chest x-ray, echocardiogram, and nuclear medicine cardiolite stress test, all of which had normal results. (R. 209, 210, 212.) She also underwent an EGD with biopsy for her nausea, vomiting, chest

pain, and hemooccult positive stools. This revealed a 1 cm ulcer at the pyloris, acute duodenitis, and erosive gastritis. (R. 195.) A surgical pathology report on tissue samples taken during the EGD identified no helicobacter, found no diagnostic abnormality in her small bowel mucosa, and found only reactive changes consistent with an adjacent ulcer. (R. 197.) On discharge, Colbert was diagnosed with chest pain, a gastric ulcer, gastrointestinal bleeding, and anemia. (R. 187.)

On August 19, 2003, Colbert went to the emergency room, complaining of chest pain and chest pressure radiating to her neck. She stated that she had not been able to sleep all night because of the chest pain and pressure, and that she had been having episodes of intractable nausea and vomiting. (R. 238.) She was admitted to the hospital, and placed on a proton pump inhibitor IV and intravenous pain medications. (R. 240, 245.) During her stay she underwent an EGD with biopsy, which revealed a 4 cm hiatal hernia, a 1 cm ulcer in the antrum that was healing and improved, acute duodenitis, acute gastritis, and slight chronic inflammation of the gastric antrum. She also underwent a colonoscopy, which revealed diverticula scattered in the colon with inflammation of the right colon, and a CT scan of the brain, with negative findings. (R. 244.) Gastric emptying studies were ordered, but were for some reason not completed. (R. 245.) By August 26, 2003, Colbert's nausea was improved, but she continued to have abdominal pain. On August 27, 2003, she was feeling better and had managed to keep her breakfast down, and so wanted to go home. She was discharged on that date in stable condition. (R. 245.)

On September 10, 2003, Colbert returned to the emergency room, again

complaining of nausea, vomiting, and epigastric pain.  She had begun vomiting earlier that day several times, and then subsequently developed abdominal pain, first in the epigastric area, and then in the right upper quadrant.  (R. 292.)  The emergency department report noted that Colbert did not report diarrhea or chest pain at this visit.  (R. 282.)  She requested "some more nausea medicine but not pain medicine."  (R. 283.)  She had a chest x-ray taken, but it was "grossly negative for significant or acute findings."  (R. 299.)  She was admitted to observation, hydrated, and given symptom relief.  (R. 284, 291.)  The attending physician assessed her as having "[c]hronic intermittent abdominal pain with nausea and vomiting," and noted that she had recently undergone extensive testing at her earlier visits.  (R. 293.)  He recommended a repeat endoscopy in the future to assure that her gastric ulcers had healed properly.  (R. 293.)  Colbert underwent an ultrasound examination of her right upper quadrant, including her liver.  There were no significant findings.  (R. 300.)  On September 12, 2003, Colbert was discharged to home in stable condition, with instructions to follow up with her regular physician in five to seven days, and prescribed numerous medications to treat her symptoms.  (R. 288.)

On November 13, 2003, Colbert again went to the emergency room, complaining of a two-day history of nausea, vomiting, and diarrhea.  (R. 305.)  She claimed that she was experiencing vomiting approximately five times per day and could not tolerate liquids or solids.  Colbert also complained of substernal chest pain radiating into the neck and left arm during her episode of nausea and vomiting just prior to arrival at the emergency room.  (R. 305.)  Colbert was admitted to the

hospital, and given hydration, antiemetics, and Pepcid. She was given another EGD with biopsy, which revealed acute duodenitis, acute gastritis, and a healed gastric ulcer. (R. 312.) On November 18, 2003, Colbert was discharged to home in stable condition. She was prescribed medication to treat her symptoms, advised to stop taking Wellbutrin, and instructed to follow up with her regular physician in five to seven days. (R. 306.)

On May 29, 2004, Colbert went to the emergency room, complaining of mid-sternal chest pain that awoke her from sleep, and associated shortness of breath. (R. 359.) She stated that she had had some nausea, vomiting, and diarrhea two days previously, but was only suffering from nausea at the time of admission. Colbert was administered aspirin and nitroglycerin by the emergency squad, and was given saline for rehydration and nitroglycerin paste on her chest at the time of her admission for observation. (R. 361.) Later, she was administered a Heparin drip and Coumadin. She had a chest x-ray taken, with unremarkable results. (R. 392.) On May 30, she underwent a computed tomography of her abdomen with IV contrast; this revealed questionable inflammatory changes in the region of her pancreas, and suspected thrombus in the right common iliac vein. (R. 393.) On June 2, she underwent a Lower Extremity Venous Duplex Exam, but the findings were generally unremarkable. (R. 395.) On June 3, Colbert underwent a lumbar x-ray, which revealed mild degenerative disc disease between L4 and L5, and some mild facet joint degenerative changes involving the L5/S1 facet joints. (R. 394.) Colbert was feeling better on June 4, and was discharged to home, with various

prescriptions and instructions to follow up with her regular physician. (R. 369.)

On December 8, 2004, Colbert went to the emergency room for a follow-up to an emergency room visit of December 2, 2004 for symptoms of anemia (of which no information otherwise appears to be in the record). (R. 531-532.) She was transfused four units of blood at the time. The attending physician at her follow-up noted that Colbert's abdomen was diffusely tender to palpitations. (R. 531.)

Stephen Rhinehart, M.D.  On March 13, 2001, Dr. Rhinehart administered a routine gynecological examination to Colbert. She complained of low energy, bowel problems, and reduced appetite. (R. 449.) On April 10, 2001, her physician requested a follow-up PAP recheck in three months. (R. 449.)

On June 6, 2001, Colbert returned for a follow-up gyneocological check, and reported that she was "still struggling with diarrhea after her Cholecystectomy and she is still light headed from her anemia". (R. 445.)

On June 13, 2001, Colbert saw Dr. Rhinehart, complaining of severe nausea and emesis, "unable to hold down anything even water over the past 2 days". (R. 444.) Colbert opined that her symptoms had gotten progressively worse since her gallbladder surgery. Dr. Rhinehart noted, "I think chronic diarrhea likely secondary to cholecystectomy." (R. 444.)

On September 4, 2001, Colbert again went to Dr. Rhinehart's office (and was apparently seen by a different physician), complaining of persistent nausea with vomiting if she ate a full or partial meal, and bowel problems. (R. 443.) She also

complained of lack of energy, noting that she had formerly been able to work 40-50 hours per week, and now could not even do her laundry without exhaustion. The examining physician noted abdominal tenderness in all four quadrants. He assessed her as having diarrhea, nausea, and anemia, and recommended that she follow up with Dr. Rhinehart. (R. 443.)

On September 25, 2001, Colbert returned to see Dr. Rhinehart for a follow-up. She complained of continued abdominal cramping pain, bowel problems, and a lot of lower quadrant abdominal cramps, radiating to the upper quadrant. (R. 442.) Colbert also reported nausea and occasional vomiting with these episodes. Dr. Rhinehart noted, "[a]s far as her symptoms, they sound pretty much like IBS." Colbert's abdomen was nontender to palpitations. He discussed two new medications for her condition, gave her a trial of Bentyl, and recommended that she increase the amount of fiber in her diet.

On October 11, 2001, Colbert informed Dr. Rhinehart that the Bentyl was not helping her, and that she still had diarrhea three to four times daily. He scheduled a follow-up appointment for the following day, but advised her to go to the emergency room if her symptoms worsened. (R. 442.)

On October 12, 2001, Colbert saw Dr. Rhinehart for a follow-up appointment, for likely irritable bowel syndrome, anxiety, depression, and status post cholecystectomy. (R. 441.) She continued to report bowel problems and abdominal pain, especially when using Bentyl. Dr. Rhinehart again counseled her to increase fiber intake, and recommended a one week clinical trial with Levsin.

On March 12, 2002, Colbert visited Dr. Rhinehart for a follow-up on a prior abnormal PAP. (R. 440.) She reported her main complaint at the time as "her usual sx of IBS", with frequent diarrhea, and that Levsin had not been helpful; in addition, she was vomiting two to three times per week  Dr. Rhinehart encouraged her again to increase fiber intake, and prescribed Prevacid, to "[s]ee if can correct the nausea and spitting up problem."

On October 22, 2002, Colbert visited Dr. Rhinehart, complaining of migraine headaches and vomiting. He noted that she had suffered chronic diarrhea since her gall bladder removal. Dr. Rhinehart diagnosed her with migraine headaches and prescribed her Toradol and Phenergan suppositories. (R. 438.)

On November 19, 2002, Colbert saw Dr. Rhinehart for a follow-up to her annual gynecological examination. (R. 437.) She reported that she continued to have a lot of irritable bowel syndrome symptoms, and diarrhea once or twice a week (sometimes increasing in length to episodes of four days or more).

On September 3, 2003, Colbert visited Dr. Rhinehart for a follow-up to her July-August 2003 hospitalizations for intractable vomiting and epigastric pain. (R. 434.) He noted that Colbert had a very pronounced gag reflex and that she had a hard time swallowing her medications, but that she had reported an improved ability to eat smaller meals.

On October 1, 2003, Colbert visited Dr. Rhinehart again, complaining of nausea about five times per week, and an inability to eat or take medications when nauseated. (R. 433.) He discussed with her medication changes to try to control her

nausea until they could get her ulcer and gastritis healed, so that she would be able to eat and to take medications.

On July 19, 2004, Colbert visited Dr. Rhinehart, complaining of sharp, pressure-like pain in her right groin which came and went. (R. 423.) Upon physical examination, Dr. Rhinehart found that Colbert had tenderness to palpitation in her right lower quarter. He diagnosed her with right lower quarter pain, likely muscular and gastrointestinal in origin. He prescribed her deplenol, and advised her to follow up in 48 hours.

On September 30, 2004, Colbert visisted Dr. Rhinehart, complaining of episodes of stomach pain, constant nausea, diarrhea, and vomiting once or twice per week. (R. 421.) She stated that her pain radiated from epigastric pain to her pelvic area, and that the diarrhea and cramping could become severe. Dr. Rhinehart examined her, finding diffuse tenderness throughout the region. He diagnosed her with diarrhea and abdominal pain, and referred Colbert, at her request, to a gastroenterologist.


State Agency Physicians. On April 12, 2004, Maria P. Congbalay, M.D., conducted, at the request of a state disability determination agency, a physical residual functional capacity assessment of Colbert from her medical records. (R. 334.) Dr. Congbalay evaluated Colbert for a primary diagnosis of gastric ulcer, and a secondary diagnosis of reactive gastropathy. She found that Colbert could occasionally lift up to 50 pounds, that she could frequently lift or carry 25 pounds,

that she could stand or walk for about 6 hours in an 8-hour workday, that she could

sit for about 6 hours in an 8-hour workday, and that her ability to push or pull was

unlimited. (R. 335.) Dr. Congbalay identified no postural, manipulative, visual,

communicative, or environmental limitations. (R. 336-337.) She stated that Col-

bert's symptoms were attributable to a medically determinable impairment, but

that the severity or duration of the symptoms was disproportionate to their expect-

ed severity or duration. Dr. Congbalay found Colbert "partially credible" in alleging

recurrent abdominal pain, nausea, and vomiting. Under "additional comments",

she noted "Psych?" (R. 338.)

On July 19, 2004, Jerry Liepack, M.D. conducted, at the request of a state

disability determination agency, a physical residual functional capacity assessment

of Colbert from her medical records. (R. 414.) Dr. Liepack evaluated Colbert for a

primary diagnosis of a thrombus common iliac vein, and a secondary diagnosis of

history of gastric ulcer. He found that Colbert could occasionally lift up to 20

pounds, frequently lift or carry 10 pounds, stand or walk for at least 2 hours in an

8-hour workday, sit less than 6 hours in an 8 hour workday "due to thrombus", and

that her ability to push or pull was limited in her lower extremities (as she could

not operate dictaphone foot controls on her right side). (R. 415.) Dr. Liepack

identified no manipulative, visual, or communicative limitations, but found that

Colbert could only occasionally climb stairs or kneel, and that she should never

climb ladders or rope or crouch. (R. 416.) He also noted that she should avoid all

exposure to hazards such as machinery or heights, and that, due to the fact that she

16

was on Coumadin, she should avoid situations where she could easily be contused or suffer lacerations.  (R. 417.)  Dr. Liepack found that Colbert's symptoms were attributable to a medically determinable impairment, that the severity or duration of the symptoms was not disproportionate to their expected severity or duration, and that their severity was consistent with the total medical and non-medical evidence at hand.  (R. 417-418.)


**Mental Impairments**.

Kathy Shy, M.D  Colbert saw Dr. Shy on September 20, 2002 for a psychiatric examination.[2]  Dr. Shy recorded that Colbert had complained to her of continuing GI upset and almost daily diarrhea for the past two weeks, as well as lightheaded-ness, daily migraine headaches, nausea, and low energy.  (R. 496.)  Dr. Shy observ-ed that Colbert was neatly groomed and looked about her stated age, and denied any suicidality or homicidality.  She diagnosed Colbert with unchanged Major Depressive Disorder (a single episode), moderately severe without psychotic feat-ures, in partial remission, and persistent intrafamilial discord.  She advised no changes to Colbert's psychotropic medication regimen, as her current gastrointest-inal problems would affect the absorption rate of her medications.  (R. 497.)  Dr. Shy recorded that, at the time of her examination, Colbert was taking buproprion,

---

[2]  Dr. Shy's notes refer to a prior appointment on August 16, 2002, but records of this appointment do not appear to be in evidence.  (R. 496.)

olanzapine, propranolol, rabeprazole, promethazine, metoclopramide, almotriptan, and ECASA. (R. 496.)

On October 25, 2002, Colbert visited Dr. Shy for another psychiatric appointment. Colbert reported to Dr. Shy that she had initially improved for about two weeks after her prior appointment, and then for the next two weeks had suffered an almost constant migraine headache, severe nausea, vomiting, and intermittent diarrhea. She complained that for the prior four or five days she had been unable to take any medication at all due to this condition. (R. 495.) Dr. Shy recorded that Colbert was satisfactorially groomed, but appeared pale and quite tired. She again diagnosed Colbert with unchanged Major Depressive Disorder (a single episode), moderately severe without psychotic features, in partial remission, and persistent intrafamilial discord. (R. 496.) Dr. Shy also gave Colbert a one-week supply of orally dissolving olanzapine tablets.

On December 13, 2002, Colbert visited Dr. Shy for another psychiatric appointment. Colbert again complained that she had felt better until two weeks before her psychiatric appointment, at which time she had suffered from an almost constant migraine headache, severe nausea and vomiting, and intermittent diarrhea. (R. 492.) She reported that her headaches had decreased in intensity, but that she still had them every day and was frequently nauseated, and that on some days she felt so ill that she did not want to get out of bed. Dr. Shy recorded that Colbert was pale, tired, and careworn appearing, and looked older than her stated age. Her diagnosis was unchanged from the prior appointment, but Dr. Shy found

18

that Colbert's persistent infrafamilial discord was improving. (R. 493.) She increased Colbert's prescription of olanzapine, and instructed her to return in two weeks.

On February 7, 2003, Colbert visited Dr. Shy for another psychiatric appointment. She continued to report chronic GI upset, with frequent abdominal pain and bouts of diarrhea at least two or three times per week. (R. 490.) Dr. Shy's diagnosis was unchanged from Colbert's prior appointment. (R. 491.) She recorded that Colbert was pale and slightly unkempt, and looked tired and older than her stated age. Dr. Shy noted that Colbert remained in only partial remission from MDD, and that she had been unable to augment Colbert's bupropion with lithium because of her persistent GI upset. (R. 491.) She prescribed hydroxyzine pamoate for persistent abdominal pain and anxiety, and instructed Colbert to return in two months or sooner.

On April 4, 2003, Colbert visited Dr. Shy for another psychiatric appointment. She reported that the hydroxyzine had been effective in relieving intense anxiety, but that she seldom used it because she preferred to stay inside alone. Colbert also claimed that she would like to be able to return to work, but that her chronic GI problems were an obstacle to this. (R. 487.) She continued to report almost daily headaches and frequent abdominal pain and diarrhea. Dr. Shy's diagnosis was unchanged from Colbert's prior appointment. (R. 488.) She recorded that Colbert was pale and satisfactorially groomed, and looked older than her stated age. Dr. Shy noted, "Mrs. Colbert is certainly no better and her depression remains

complicated by significant general medical comorbidity and, notably, pain. I have decided to try adding a dual agent (SNRI) antidepressant to target this depressive syndrome complicated by physical symptoms, including pain." (R. 488.) Dr. Shy prescribed venlafaxine XR, and instructed Colbert to return in six to eight weeks.

On May 16, 2003, Colbert visited Dr. Shy for another psychiatric appointment. Colbert reported no significant change in her level of depression, and that she continued to have intermittent diarrhea, nausea, and vomiting. (R. 485.) Dr. Shy's diagnosis was unchanged from Colbert's prior appointment, but she noted that Colbert had had some improvement in her depression with low dose venlafaxine and that she was tolerating it well. (R. 486.) She instructed Colbert to return in six weeks or sooner.

On June 27, 2003, Colbert visited Dr. Shy for another psychiatric appointment. Colbert reported that she had become less depressed, and that she did not currently consider herself to be significantly depressed. She also reported that her diarrhea had diminished, and that her migraine headaches had decreased down to one every one or two weeks, albeit with a chronic, almost constant dull headache. (R. 481.) Dr. Shy reported that Colbert did "not look particularly tired". Her diagnosis was unchanged, but she noted that Colbert's intrafamilial discord was "probably resolved." (R. 482.) Dr. Shy stated also: "Ms. Colbert is doing better, but is certainly not in remission from the standpoint of MDD." She increased Colbert's venlafaxine dosage, and instructed her to return in two months or sooner.

On September 30, 2003, Colbert visited Dr. Shy for another psychiatric

appointment. Colbert reported that she had recently been repeatedly hospitalized for increasing severe GI distress, and that, because of her frequent vomiting, she had been unable to keep down her prescribed medications. (R. 478.) Dr. Shy diagnosed Colbert with "MDD, single episode, moderately severe without psychotic features, worse." (R. 479.) She noted that Colbert had been unable to take psychotropic medications on a regular basis because of persistent nausea and vomiting, and substituted dissolvable medications to compensate for Colbert's GI problems.

On October 28, 2003, Colbert visited Dr. Shy for another psychiatric appointment. She continued to report persistent nausea and vomiting, but that she had been feeling a little better psychologically because of improved sleep. (R. 476.) Dr. Shy's diagnosis was unchanged, though she noted that Colbert was "a little better." (R. 477.) She increased Colbert's dosage of mirtazapine.

On December 16, 2003, Colbert visited Dr. Shy for another psychiatric appointment. She reported feeling more depressed because of the holiday season, and that she had recently been re-hospitalized for exacerbation of GI upset. (R. 474.) Dr. Shy's diagnosis was unchanged, though she noted that Colbert was "again possibly slightly improved." (R. 475.) She again increased Colbert's dosage of mirtazapine.

On February 10, 2004, Colbert visited Dr. Shy for another psychiatric appointment. Colbert reported frequent GI upset, including diarrhea, and lack of energy. (R. 472.) Dr. Shy's diagnosis was unchanged, noting again that Colbert was "possibly slightly improved." (R. 473.) She, at Colbert's request, increased her

dosage of mirtzapine again.

On May 4, 2004, Colbert visited Dr. Shy for another psychiatric appointment. Colbert reported that she had been tolerating her increased dosages of mirtzapine well, but that her GI upset had recently become more severe, with almost daily nausea and vomiting. She also reported that she stayed close to home, afraid to get too far away because of her frequent GI upset. (R. 469.) Dr. Shy diagnosed Colbert as "MDD, chronic, moderately severe without psychotic features, probably unchanged and in only partial remission." (R. 470.) She made no changes to her medication, noting that Colbert had reported them effective despite only being able to take them erratically. However, Dr. Shy also stated: "I have strongly recommended that she push for another gastroenterology referral. Her symptoms are quite severe and not responding to symptomatic intervention." (R. 470.)

On July 16, 2004, Dr. Shy wrote a letter to Colbert's landlord, in response to threats that she might lose her housing if she did not get rid of her pet dog, stating that Colbert had severe psychiatric and general medical problems which made it "very difficult for her to spend much time away from her house." (R. 468.) Dr. Shy stated that Colbert significantly depended on her relationship with her dog for psychological support, and that the consequences of their separation might be life threatening.

On July 27, 2004, Colbert visited Dr. Shy for another psychiatric appointment. Colbert reported that she had been vomiting less, but was still chronically nauseated, and that she had become increasingly more anxious. (R. 466.) Dr. Shy's

22

primary diagnosis was unchanged, though she stated that Colbert was "in at least partial remission (somewhat improved)." (R. 467.) She added an additional diagnosis of "Anxiety disorder, NOS (persistent edginess and excessive startle)." As Colbert was reporting less vomiting and had been able to absorb more medication, Dr. Shy noted that she had decreased Colbert's dosage of buproprion and added clonazepam wafers.

On September 21, 2004, Colbert visited Dr. Shy for another psychiatric appointment. Colbert reported that she continued to have severe GI upset, was constantly nauseated, and had frequent diarrhea, though less frequent vomiting. She stated that she spent most of her time at home, although she had been taking time to help out her ill parents, doing most of their grocery shopping, paying their bills, and doing their laundry every week. (R. 464.) Dr. Shy's diagnosis was unchanged, though she stated that Colbert was "in at least partial remission (stable)". She noted that "Mrs. Colbert is not significantly depressed, but still complains of rather intense anxiety". (R. 465.) She increased Colbert's clonazepam prescription.

On September 21, 2004, Dr. Shy made out, on a prescription pad blank, a note reciting "Mrs. Colbert remains under my care & unable to work." (R. 463.) At the bottom is written, "This is a copy of a note that my psychiatrist that is sent to the county to receive food stamps. If you need to know I get $116. per month for foodstamps. Sincerely Patricia Colbert." On October 8, 2004, Dr. Shy made out a similar note, which stated "Mrs. Colbert is under my care & is unable to work

23

indefinitely." (R. 462.)

On November 16, 2004, Colbert visited Dr. Shy for another psychiatric appointment. Colbert reported "not feeling particularly depressed", but that she continued to have significant general medical problems, including daily bloody diarrhea, anemia, and fatigue. (R. 559.) She stated that her nausea and vomiting were less, but that her diarrhea was still frequent. Colbert again reported that she was spending a significant portion of her time assisting her parents, doing their finances, laundry, grocery shopping, and cooking some of their meals. She also reported that she was able to walk her dog three times daily. Dr. Shy's diagnosis was unchanged, though she did note that Colbert's anxiety disorder was "significantly improved." (R. 560.) She made no changes to Colbert's medications.

Keli Yee, Psy.D. Dr. Yee, a psychologist, conducted a consulting evaluation on April 15, 2004 at the request of the state disability determination agency. She noted that, when asked why she considered herself disabled, Colbert "stated that she has real bad digestive and intestinal problems, migraines and depression." (R. 341.) Colbert also reported that she had most recently been employed in 2000, but had stopped when the store had closed, and that she had been unemployed in the interval at first because she did not have to work, and after that because of physical health reasons. (R. 342.) Dr. Yee diagnosed Colbert with adjustment disorder with mixed anxiety and depressed mood, with a psychosocial stressor of health, financial and social problems, and noted also migraines, diverticulitis, gastritis, irritable

bowel syndrome, and ulcers. (R. 345.) She evaluated Colbert with respect to work-related mental abilities, finding that her ability to relate to others was moderately impaired, her ability to follow directions was not impaired, her ability to perform repetitive tasks was not impaired, her ability to withstand stress was moderately impaired, and her ability to manage money was not impaired. (R. 345-346.)

Bruce T. Goldsmith, Ph. D. and Steven J. Meyer, Ph. D. Two state agency psychologists reviewed the record to conduct a mental residual functional capacity assessment in May and July 2004. They found that Colbert had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (R. 349.) They also found her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, her ability to interact appropriately with the general public, and her ability to respond appropriately to changes in the work setting to be moderately limited. (R. 352.) The assessment stated: "The claimant is still capable of performing work in a low production demand work environment with limited contact with the general public", if she remained in compliance with her prescription medications. (R. 353.) It noted further that the claimant's allegations were overall consistent with the medical evidence in the file, and that she was credible. (R. 353.)

<u>Administrative Law Judge's Findings</u>.

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2003.

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 2, 2000 through her date last insured of December 31, 2003 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.  Based on the objective medical record, through the date last insured, the claimant had the following severe impairments: irritable bowel syndrome, anemia, status/post gall bladder removal, hypertension, peptic ulcer disease, and depressive disorder (20 CFR 404.1520(c)).

4.  Through her date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, it is determined that, through the date last insured, the claimant had the residual functional capacity to perform work at the light level of exertion, limited only by her non-exertional limitations. Specifically, she could not drive for occupational purposes, or be around dangerous machinery or heights, or climb ladders, or scaffolding. She could not perform jobs where she had to have continuous contact with the public. She could not perform jobs that involve fast-paced work or production quotas. Lastly, she needed to be in close proximity to the restroom.

6.  Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

7.  The claimant was born on May 18, 1964 and was 39 years old, which is defined as a younger individual age 18-44, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not

the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11.     The claimant was not under a "disability," as defined in the Social Security Act, at any time from November 2, 2000, the alleged onset date, through December 31, 2003, the date last insured (20 CFR 404.1520(g)).

**Standard of Review**. Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)). It means "'more than a scintilla.'" *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and*

*Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments**.  Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

1.    The ALJ failed to consider Plaintiff's request that Colbert's disability insurance benefits application be treated as an oral inquiry for Supplemental Security Income benefits.

2.    The ALJ failed to consider a later onset date than that originally alleged, and only addressed records in the file that preceded Plaintiff's last date insured.

3.    The ALJ failed to consider the combined effects of Colbert's impairments.

**Analysis**.

Oral SSI application.  Colbert argues initially that her January 20, 2004 application for Title II disability insurance benefits should be treated as an inquiry for SSI benefits.  She states that she was incorrectly informed by Social Security personnel that she was not eligible for these benefits, and that therefore her inquiry about her eligibility for benefits should be considered an oral inquiry under 20 CFR §416.345.  This regulation states that an oral inquiry for SSI benefits can be used as the actual filing date for such benefits, as long as the claimant files an application on a prescribed form within sixty days of the notice of the claimant's need to file an application.  Colbert argues that she was not sent this notice, and that she should not be penalized for the failures of Social Security personnel to properly explain to her the types of benefits, to properly inform her of her eligibility, and to send her

the notice.

This regulation provides in relevant part that:

We will use the date of an oral inquiry about SSI benefits as the filing
date of an application for benefits only if the use of that date will result
in your eligibility for additional benefits and the following
requirements are met:

(a)     The inquiry asks about the claimant's eligibility for SSI benefits.
[...]
(d)     The claimant or a person on his or her behalf as described in
        §416.315 files an application on a prescribed form within 60
        days after the date of the notice we will send telling of the need
        to file an application.  The notice will say that we will make an
        initial determination of eligibility for SSI benefits if an applica-
        tion form is filed within 60 days after the date of the notice.  (We
        will send the notice to the claimant or, where he or she is a
        minor or incompetent, to the person who made the inquiry.)

Colbert argues generally that she "should not suffer" because of the errors or

omissions of Social Security employees, and that she should be considered to have

made a constructive application for SSI benefits on January 21, 2004.  This is

equivalent to an argument that the Commissioner, because of the actions of Social

Security personnel, should be estopped from denying that Colbert applied for SSI

benefits.  However, the Court has no power to entertain such an argument, as it is

"no more authorized to overlook the valid regulation requiring that applications be

in writing than it is to overlook any other valid requirement for the receipt of bene-

fits." *Schweiker v. Hanse*, 450 U.S. 785, 790 (1981) (where a claimant is erroneous-

ly told that she is not eligible for benefits, the Social Security Administration will

not be estopped from denying her eligibility).  *See also Ray v. Heckler*, 629 F.Supp.

1113, 1121 fn 5 (N.D. Ga. 1986) (equitable estoppel cannot be asserted against the

government in social security cases). Accordingly, the Court cannot find that the Commissioner is estopped from denying that Colbert applied for SSI benefits on January 21, 2004, or hold that her oral inquiry alone satisfies §416.345.

Combined physical and psychiatric impairments with an August 1, 2003 date of onset. Colbert's other arguments are related. She argues that the ALJ's opinion was fundamentally flawed in two different ways: first, because he failed to analyze her disability status using an onset date of August 1, 2003, as she had requested in her closing statement, and second, because he evaluated her physical and mental impairments separately instead of considering their combined effect. Colbert also argues that the ALJ erred by only addressing records in the file that preceded her date last insured, because subsequent medical evidence could have been probative of her condition prior to the expiration of her insured status.

In her written closing statement, Colbert stated:[3]

In short, claimant's counsel has the authority to amend Ms. Colbert's onset date to August 1, 2003, the date of the first hospitalization for gastrointestinal problems (Exhibit 4F). Claimant's counsel further suggests that the combination of the above cited evidence supports Ms. Colbert's testimony in regard to the frequency of gastrointestinal problems including nausea, vomiting, and diarrhea, to the extent that it would be work reclusive [sic] from the amended onset date of 8/1/03 through the present time.

(R. 25.) The ALJ's opinion makes no reference to the amended onset date. However, it does clearly consider whether Colbert was disabled on or before December 31, 2009: "After careful consideration of all the evidence, it is concluded the claim-

---

[3] The ALJ explicitly permitted this written closing statement. (R. 718-719.)

ant was not under a disability within the meaning of the Social Security Act from November 2, 2000 through the date she was last insured." (R. 14.)

Nonetheless, plaintiff is correct in asserting that the decision does not expressly consider a number of treatment records from 2003 and 2004. During that time, the following treatment notes refer to Colbert's complaints of nausea, diarrhea and vomiting:

- February 7, 2003. Colbert reported to Dr. Shy that she had bouts of diarrhea at least 2-3 times a week. (R. 490.)
- April 4, 2003. Colbert reported to Dr. Shy frequent diarrhea. (R. 488.)
- May 16, 2003. She reported intermittent diarrhea, nausea and vomiting. (R. 485.)
- June 27, 2003. Colbert's diarrhea was diminished. (R. 481.)
- July 9, 2003. Colbert went to the ER with complaints of lightheadedness and dizziness leading to nausea and vomiting. (R. 166.)
- August 1-5, 2003. Colbert was hospitalized with chest and epigastric pain, nausea, vomiting, abdominal pain, diarrhea and chest pain. (R. 181-233.)
- September 11, 2003. Colbert went to the ER with complaints of abdominal pain and persistent nausea. (R. 283-304.)
- September 30, 2003. Colbert was experiencing frequent vomiting and was unable to keep down prescribed medication. Dr. Shy prescribed dissolvable medications. (R. 478.)
- October 28, 2003. Colbert reported persistent nausea and vomiting. (R. 476.)
- November 13-18, 2003. Colbert went to the ER with a 2-day history of nausea, vomiting and diarrhea. She had been vomiting around 5 times a day. She was hospitalized and discharged 5 days later in stable condition. (R. 305.)
- December 16, 2003. Colbert reported her November hospitalization to Dr. Shy. (R. 474.)
- February 10, 2004. Colbert reported to Dr. Shy that she had been experiencing frequent diarrhea. (R. 472.)
- May 4, 2004. Colbert's GI upset had recently become more severe with almost daily nausea and vomiting. (R. 469.)
- May 29, 2004. Colbert went to the ER with complaints of midstern-

al chest pain.  She had experienced some nausea, vomiting and diarrhea during the previous  two days, but not at the time of admission.  (R. 359.)

- July 27, 2004.  Colbert  reported to Dr. Shy that she was vomiting less but still had chronic nausea.  (R. 466.)
- September 21, 2004.  Colbert continued to have severe GI upset. She was constantly nauseated with frequent diarrhea and less frequent vomiting.  (R. 464.)
- November 16, 2004.  Colbert was having daily bloody diarrhea.  Her nausea and vomiting were less.  (R. 559.)

Plaintiff's argument is that this evidence demonstrates that she was disabled on or before December 31, 2003.  The ALJ held that she was not.  However, the ALJ's decision does not address this evidence and explain why it does not amount to substantial  evidence supporting a finding of disability.

There is substantial  evidence supporting the ALJ's finding that physically Colbert retains the ability to perform work having light exertional demands.  The question is whether her non-exertional impairments--principally nausea, diarrhea and vomiting, but also restrictions based on her depression and anxiety disorder-- prevent her from working.  The ALJ squarely held that they did not.  He held that Colbert could perform jobs that involved little contact with the public, no fast paced work or production quotas and provided close access to a restroom.

The difficulty is that the ALJ's decision did not expressly address all the medical evidence from 2003 and 2004 that bears upon those findings.

A review of the ALJ's opinion shows that he did devote attention to records of Colbert's physical medical condition between August 2003 and December 2003.  He notes Colbert's August, September, and November 2003 hospitalizations for recur-

rent chest pain, nausea, and vomiting. (R. 18.) How-ever, all the medical evidence which the ALJ cited to support his conclusions as to Colbert's level of impairment or credibility appears to have been from before August 1, 2003:

- R. 20, citing evidence from September 4, 2001 (R. 443): "It is noteworthy that the claimant reported that she stopped working in February or March 2000 due to her illnesses (Exhibit 1E/2). However, she did not file her application until 2004, which suggests that she may have been able to work prior to December 1, 2003. Moreover, she inconsistently testified that she did not stop working due to an illness, but rather because her husband did not want her to work. Later, she did not complain to any treating doctor or physician that she could not work. She merely related to her doctor that because of her symptoms she had experienced decreased energy and could not do the things she used to, such as hiking (Exhibit 15F/24).

- R. 20, citing evidence from October 25, 2002 (R. 494), October 22, 2002 (R. 438), and November 19, 2002 (R. 437): "Moreover, the evidence shows that the claimant appears to have been somewhat noncompliant with recommended treatment. In October 2002, the claimant related to her treating psychiatrist that she was not taking any medication (Exhibit 16F/33) even though she had been prescribed medication and suppositories just days before her visit (Exhibit 15F/19). While she reported to her psychiatrist that she stopped taking medication because of intractable nausea, she did not make that same report to her treating physician at a follow-up appointment the following November (Exhibit 15F/18)."

- R. 21, citing evidence from September 4, 2001 (R. 443), December 13, 2002 (R. 492), October 25, 2002 (R. 494), and September 20, 2002 (R. 496): "The claimant reported at one point during her testimony that even doing laundry wiped her out, but she later stated that she was doing the laundry for her parents without difficulty (Exhibit 15F/24 and 16F/31). Likewise, she cared for all the needs of both of her parents, including her mother for a great deal of time, despite her alleged persistent IBS symptoms, and without assistance. Moreover, the claimant was able to navigate through the social welfare and Medicare system to obtain benefits and home health care for her mother (See Exhibit 16F/31, 33, and 35).

It is therefore difficult to identify from the ALJ's analysis what evidence he

relied on to support his finding that Colbert was not disabled after her cycle of hospitalizations began around August 1, 2003, because he did not cite to any medical evidence from that period.[4] The portions of the record selected by the ALJ to support his residual functional capacity findings are all drawn from 2001-2002. The ALJ's findings as to Colbert's credibility seem likewise to have been based upon comparing her testimony at the hearing with medical evidence from before August 1, 2003.[5] (R. 19-20.)

Colbert appears also to be correct that the ALJ did not cite to medical evidence from after her last date insured. Such evidence was relevant to whether the condition which caused her hospitalizations in late 2003 turned out to be a persistent and disabling condition. The ALJ's failure to cite to any medical evidence from after Colbert's last date insured is consistent with his primary focus upon an earlier period, and it is to be presumed that a new analysis relating specifically to Colbert's amended onset date would take into account such evidence if the ALJ found it relevant.

---

[4] The ALJ also cited to the April 2004 state agency physician's residual functional capacity assessment (R. 334-339), and gave it "great weight". (R. 19.) However, the ALJ's opinion as to this assessment – that Colbert could work a full range of light level activity, *limited only by her non-exertional limitations* – does not appear to be in controversy. The question central to Colbert's disability determination is not her ability to, *e.g.*, lift a certain weight, but rather the extent of her non-exertional limitations (such as whether her bowel problems render her essentially unemployable).

[5] The testifying vocational expert, Lynne Kaufman, stated that if Colbert's allegations that she needed at least five bathroom breaks per day for nausea and diarrhea were true, there were "no jobs" available to her. (R. 718.)

Colbert's final argument is that the ALJ erred by failing to consider the combined effects of her impairments. The ALJ, in his opinion, found that Colbert had severe impairments of irritable bowel syndrome, anemia, status/post gall bladder removal, hypertension, peptic ulcer disease, and depressive disorder. (R. 16.) However, he found that neither her mental nor physical impairments met or medically equalled a listed impairment. Colbert cites 42 U.S.C. §423(d)(2)(B), which states:

> In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

Gordon B. Snider, M.D. testified as a medical expert at the hearing.[6] Colbert points out the following exchange:

> Q [by the ALJ]: Any of her impairments meet or equal any listing prior to December 31, 2003?
> A:   Well, exclusive of her major depressive disorder, I'd say, no.
> Q:   And you're, what, not able to testify about the depressive based on her, based on your –
> A:   Well –
> Q:   – background as an internist, in terms of meeting or equaling a listing?
> A:   We, we as internists, treat a lot of people with depression, and a lot of people with depression have a lot of gastrointestinal problems. And in this case, that's kind of a classic case of a depressive

---

[6] The ALJ stated that he gave "great weight" to Dr. Snider's opinion. (R. 19, 21.)

disorder with a lot of psychophysiologic reaction to it. The chronic diarrhea, the irritable bowel, the peptic ulcer disease, those are all related to her depressive disorder. In other words, quote, un-quote, they are psychosomatic diseases, meaning that the psyche plays a big part in their etiology.

Q: Um-hum. But you couldn't testify that she meets or equals any listing – mental, mental listing –

A: Well, no, there's not – you know, there's no history of psychosis. She was suicidal, apparently, or had suicidal thoughts, but that's you know – I don't – I think what we're seeing here is a lady who's trapped in a very unfortunate situation, and she's got a depressive disorder and a lot of GI side effects from it.

Q: Um-hum.

A: A lot of organic disease secondary to it.

(R. 702-703.) Later, upon questioning by Colbert's representative, Dr. Snider testified:

Q: My question would be – you've given us a little bit of insight. You say, as internist, you deal sometimes with the psychological sequela in regard to gastrointestinal problems, I guess. The testi-mony of Ms. Colbert in regard to the frequency she needs to use the bathroom, and the testimony about a couple, two, three days a week where she's using it many times a day, is that consistent, in your experience, given the combination of the gastrointestinal im-pairments you've identified, in combination with the major de-pressive disorder or other psychological symptoms?

[...]

A: [...] Her diarrhea's related to her irritable bowel, and she does have some diverticula. But that's what it's related to, and it's, it's due to an imbalance in her autonomic nervous system, and that's what's presumably, in her case, caused her peptic ulcer disease, because she was not H. pylori positive, and – but peptic ulcer dis-ease can have several etiologies, one of which I've just mentioned, the H. pylori; and the other one is stress and, and depression. And, and, you know, I think she's a classical case of somebody who's got a very upset GI tract secondary to her emotional prob-lems. And her emotional problems are related to, presumably, domestic unrest. It's oftentimes related to a lot of repressed anger.

[...]

Q: I think October was – again, is that, those types of comments, again, in your experience, kind of consistence [sic], when you have this combination of stress/depression with irritable bowel syn-

drome?

A:   It can be, it can be.  You can – you know, we can have all shades
of this.  You can, you can have it from severe ulcerative colitis
back down to irritable bowel and frequent diarrhea.  So, it can be
any, any manifestation.  But in her case, it's been primarily just
irritable bowel.  Because she's been scoped, and scoped, and
scoped, and they, you know, never found any ulcerative disease or
Crohn's disease.  So, we have to assume it's an imbalance in her
autonomic nervous system, all related to emotional turmoil.

(R.  707-710.)

It appears from the hearing transcript that Dr. Snider opined that Colbert
had no significant physical impairments to light exertion.  (R. 704.)  It also appears
that he opined that Colbert did not explicitly meet any mental listing, because, *e.g.*,
"there's no history of psychosis".  (R. 702.)  Snider also testified that Colbert appar-
ently suffered from psychosomatic disease.  (R. 702.)  He acknowledged her gastro-
intestinal illness, but stated that "we have to assume" that it was derived from
psychological problems, because examination had not found any physical cause.

Dr. Snider diagnosed Colbert with "depressive disorder with a lot of psycho-
physiologic reaction to it".   However, the administrative law judge's opinion did not
expressly address the limitations imposed by Colbert's psychosomatic illness on and
after August 1, 2003.  The ALJ should, upon remand, obtain testimony from a
psychological or psychiatric expert concerning the combined effects of Colbert's
mental and physical impairments.

Ultimately, the ALJ is the finder of fact.  I express no opinion on the ultimate
issue of disability.  There is evidence going both ways in the record.  I only find that
it was error for the ALJ to fail to address Dr. Snider's diagnosis that Colbert was

37

suffering from psychosomatic illness, where an ALJ is required to consider the combined mental and physical effect of an individual's impairments without regard to whether they would, if considered separately, render a finding of disability. An ALJ has the duty to resolve conflicts of evidence, but there appears in this case to be insufficient evidence upon which to base any conclusion.

Therefore, I **RECOMMEND** that this matter be **REMANDED** to the administrative law judge for further proceedings. The administrative law judge should evaluate Colbert's application for benefits based upon her stated onset date of August 1, 2003. Furthermore, the administrative law judge should obtain a consultative examination of the claimant pursuant to 20 C.F.R. §404.1512(f) to determine the nature and effect of a psychological basis for the claimant's gastro-intestinal illness.

If any party objects to this Report and Recommendation, that party may, within ten (10) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the party thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgement of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892

F.3d 15, 16 (2d Cir. 1989).

s/Mark R. Abel
United States Magistrate Judge